ORIGINAL

1  PETER T PAPOULIAS TRUST
2  c/o Trustee PETER T PAPOULIAS
3  4175 Breckenridge Court
4  Alpharetta, Georgia 30005
5  Tel:404-704-0898
6  peterpapoulias@hotmail.com
7

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

JUN 24 2013

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

8  # UNITED STATES DISTRICT COURT FOR THE

9  # NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION

10
11
12  PETER T PAPOULIAS TRUST                 )
13                                          )
14          Plaintiff,                      )
15                                          ) Case # **1:13-CV-2110**
16      v.                                  )
17                                          )
18  UNITED STATES, and IRS                  )     MEMORANDUM OF LAW
19                                          )     IN SUPPORT OF PLAINTIFF'S
20                                          )     VERIFIED COMPLAINT
21          Defendant(s),                   )
22                                          )
23
24
25

26  ## PRELIMINARY STATEMENT

27
28      Comes now plaintiff Peter Papoulias, real party in interest and grantor/beneficiary of the PETER
29  T PAPOULIAS TRUST, for his causes of action against UNITED STATES, et al., and respectfully
30  submits this Memorandum of Law in Support of Plaintiff's Verified Complaint.

31

32  This action for an immediate order for relief and for damages due to the negligent actions by the
33  defendant(s). The Defendant(s) agents acting in the course and scope of their employment at
34  INTERNAL REVENUE SERVICE through their acts and omissions knowingly, consciously,
35  wrongly, without compensation and without due process of law have effected a taking of property
36  from the Plaintiff.

37

38  ## THE COMPLAINT

39  On March 30, 2010, tax returns for the calendar years 2006, 2007, 2008, and 2009 were mailed via
40  certified mail #7009 3410 0000 9589 2997, 7009 3410 0000 9589 2980 to United States Department
41  of the Treasury Internal Revenue Division and the INTERNAL REVENUE SERVICE. The

1

42  Defendant(s) agent (IRS) sent Plaintiff a notice CP133 dated December 27, 2010, indicating that the
43  Plaintiff's tax return for calendar year 2006 had been processed and that the Plaintiff was entitled to
44  the revenue of the withholdings claimed on Plaintiff's tax return. More than three years having passed
45  since the filing of Plaintiff's returns in violation of Plaintiff's constitutional right to the return of
46  Plaintiff's property. The Plaintiff received a letter 105C dated June 22, 2011 from Defendant(s)
47  agents, indicating that the Plaintiff's claim was denied and alleging the tax return for 2006 was filed
48  after the April 15, 2010 deadline. The letter is scandalous, vexatious and further evidences the
49  ongoing malice and egregious conduct of the Defendant(s) agents.

51  ## ARGUMENTS

52  AS TO THE TAX RETURN FILED ON BEHALF OF THE PLAINTFF:

53  The tax return filed on behalf of the Plaintiff was in the nature of a claim of abandoned property held
54  by the Taxpayer banks in the form of Deposit liabilities owed to the grantor.

56  **Explanation for the attached 1041 tax return filed by PETER T PAPOULIAS TRUST, EIN 42-**
57  **6676616 for the 2006 calendar tax year.**

58  **[1] "Income Tax Return":** Webster's 1913 definition of "revenue"- n. [F. revenu, OF. revenue, fr.
59  revenir to return, L. revenire; pref. re- re- + venire to come.] 1. That which returns, or comes back,
60  from an investment; the annual rents, profits, interest, or issues of any species of property, real or
61  personal; income.

63  **The phrase "income tax return" means**: Income, or as found on line 1 of the 1041 return; "Interest
64  income" representing property claimed by the Plaintiff, was in the possession of Peter Papoulias,
65  Grantor/Beneficiary of the Plaintiff in the calendar year first, then was deposited into the banks who
66  operate in the fiscal year. The banks are allowed to use the assets to expand the money supply by
67  another 9 times. At the end of the calendar year the interest income is then returned to the Plaintiff by
68  the filing of a 1041 "TAX RETURN" and with the help of the IRS collection procedures.

70  **[2] Line 1 of the 1041:** Interest income meaning income ($52,956.50) that the grantor/beneficiary has
71  an "interest" in. The amount in line 1 represents that amount of assets that was borrowed by the
72  Taxpayer bank(s) (as indicated on the 1099 forms) during the 2006 calendar year. Page 11 of the
73  1041 instructions states "In general, a grantor trust is ignored for income tax purposes and all of the

2

74 income, deductions, etc., are treated as belonging directly to the grantor. This also applies to any
75 portion of a trust that is treated as a grantor trust."

76

77 The 1099-OID filed by PETER T PAPOULIAS TRUST, EIN 42-6676616 for the 2006 calendar year.
78 Payer: TD BANKNORTH, EIN 13-5640479
79 Recipient: PETER T PAPOULIAS TRUST, EIN 42-6676616
80 (see instructions on the back of the recipients copy B.) Instructions for Recipient: ……. "If you are
81 the holder of an OID obligation, generally you must include an amount of OID in your gross income
82 each year you hold the obligation. Obligations that may have OID include a bond, debenture, note,
83 certificate, or other evidence of indebtedness having a term of more than one year. For example, the
84 1099OID rules that apply to certificates of deposit (CD's), time deposits, bonus savings plans and
85 other deposit arrangements, especially if the payment of interest is deferred until maturity……..If as
86 the record holder, you receive Form 1099-OID showing amounts belonging to another person, you
87 are considered a nominee  recipient. Complete a Form 1099-OID for each of the other owners
88 showing the amounts allocable to each. File Copy A of the form with the IRS. Furnish Copy B to
89 each owner. List yourself as the "payer" and the other owner as the "recipient". File form(s) 1099-
90 OID with Form 1096".

91

92 Box 1 represents the amount of assets that were deposited into the TD BANKNORTH for the 2006
93 calendar year. The instructions go on to say that the amount entered in box 1 must be reported as
94 interest income on your income tax return. "B.) Box 1 "…Report the amount in box 1 as interest
95 income on your income tax return."

96

97 The TD BANKNORTH had received copies of the 1099-OID. As stated in the instructions, after
98 receiving a copy of the 1099-OID, the TD BANKNORTH filled out 1099-OID's as well. Failing to
99 file a 1099-OID "reflects a desire to delay or impede the administration of Federal tax laws" under 26
100 USC 6702(a) (2) (B).

101

102 The 1099 B form filed by PETER T PAPOULIAS TRUST, EIN 42-6676616 for the 2006 calendar
103 year.
104 Payer: PETER T PAPOULIAS TRUST, EIN 42-6676616
105 Recipient: TD BANKNORTH , EIN 13-5640479

3

**Explanation:**

Box 2 represents the amount of assets that were deposited into the TD BANKNORTH during the 2006 calendar year. $80,000.00

Box 3 represents the additional amount of public money the TD BANKNORTH was able to create due to the bank reserve laws. $800,000.00.

Box 4 shows that there was no income tax withheld.

1096 for the 1099B shows the total amount of public money that the TD BANKNORTH had created for the 2006 calendar year. Total = Box 2 plus Box 3. Roughly 28% of this amount will be collected as tax by the IRS. (as long as the undersigned claims the "Deposit Liabilities")

**[3] Line 24e on the 1041 tax return**: Payments: (see instructions on the back of the 1099-OID recipients copy B.) Box 4 "…for information on backup withholding, include this amount on your income tax return as tax withheld…."

Box 4 represents the amount of assets that the TD BANKNORTH are still withholding in an escrow account. (the TD BANKNORTH records these assets as "deposit liabilities"). The TD BANKNORTH must return these assets in order to close escrow and bring the account to a zero balance.

**"COMMERCIAL BANK LIABILITIES"** – As explained in the book "Money and Banking: A Market-Oriented Approach", Ivan C. Johnson, William W. Roberts, California State University, Northridge©1988

"The primary source of funds that enables a commercial bank to acquire assets is the bank's deposit liabilities. Deposit liabilities of commercial banks are assets of individuals, business firms, and governments, and are held by these parties because the commercial bank offers explicit interest payments and/or services. A commercial bank creates deposit liabilities when it receives the deposit of an asset, usually in the form of cash or other reserves. Although most of the bank's liabilities are deposits of one kind or another, the holders of these deposits usually do not think of themselves as lending money to the bank. The bank, in fact, is borrowing the funds from the depositors for varying lengths of time."

4

136 **"BANK DEPOSIT"** – As defined in the book "Money and Banking" Sixth Edition, David R.
137 Kamerschen, Department of Economics, University of Georgia, Eugene S. Klise, Miami University,
138 Copyright ©1976

139 "What is a bank deposit? A simple question, isn't it? Anyone can answer it. Unfortunately most
140 people will answer it incorrectly or, at best inexactly. If, without reading farther, you can accurately
141 define bank deposits, you are the exception.

142 There is a persistent confusion respecting deposits.

143 1. Deposits are our important money. Yet to the bank, the deposits of its customers are not money at
144 all.

145 2. You take a handful of currency to the bank and deposit it. However, under no circumstances
146 whatsoever do the bank's deposits consist of currency.

147 3. Most people suppose that a bank lends the deposits of its customers. In fact, however, no bank can
148 ever lend its deposits.

149

150 These apparent contradictions result from the fact that we regularly use the word deposit in two
151 entirely different, and completely inconsistent, ways. Ambiguity is inevitable unless we clearly
152 specify which meaning the word is to have. We cannot possibly, in an analysis of bank operations,
153 follow the common practice of allowing deposit to mean one thing one moment, something entirely
154 different a moment later.

155 Specifically, we must decide whether we are going to consider a deposit as being the thing that is
156 turned in to the bank – the actual checks on other banks and pieces of silver and currency- or as being
157 the sums owed to depositors. These two things are not the same at all, for one is an asset; the other is
158 a liability of the bank.

159 Logically, perhaps, the term deposit should refer to the physical asset that one surrenders to the bank.
160 There is no difficulty in understanding what has taken place if we say someone deposited $50 of
161 currency or made a deposit of $300. The customer turned in that amount to the bank, and the word is
162 used in accordance with the first definition.

163 But then we say, "The customer has a deposit of $300," we have now swung over to the second
164 definition. The deposit is an asset of the customer. It cannot possibly be at the same time an asset of
165 the bank. Exactly what is the customer's deposit asset? Certainly it in not the handful of currency or
166 the check the customer turned over to the bank teller, for these are now assets of the bank. The asset
167 of the customer received in exchange was a claim on the bank. From the bank's point of view, this

5

168  deposit, as such, is a liability. When the bank increases its assets (currency, checks on other banks,
169  other negotiable instruments), it increases its liabilities by an equal amount (or sometimes gives other
170  assets in exchange). In this respect it is no different from another firm.

171  Two hundred years ago, banks gave their notes in exchange for coin (and other assets) rather than
172  giving deposit credit for it as they do today. The increase in the bank's liability, offsetting the
173  increase in its assets, was in the volume of its notes outstanding. There was no chance for ambiguity,
174  since the promissory notes that one has given to others are clearly and unmistakably a liability for the
175  giver. The item "Deposits" did not appear on the bank's balance sheet at all.

176  But as present-day banking techniques evolved, especially in the United States, the banks ceased to
177  issue notes. Instead, when a customer brought in specie of other forms of money, the bank simply
178  made a record in its books that it owed that sum to the individual. Probably some word other than
179  "deposits" would have been less troublesome. If at the outset the banks had called these "Customer
180  Accounts", perhaps, or "Public Credits", much confusion might have been avoided. Unfortunately the
181  assets were termed the liabilities "Deposits" because in a great many instances it was a deposit (asset)
182  that created the liability.

183  Bankers themselves universally agree in drawing up their balance sheets to list the deposits as the
184  sums that they owe. A bank never lists as deposits its holdings of currency and coin. These holdings
185  of currency and coin are classified as Vault Cash and appear, quite properly, on the asset side of the
186  sheet.

187  A bank's deposits, then, are the amounts that it owes to its customers."

188  Money and Banking Sixth Edition, David R. Kamerschen, Department of Economics, University of
189  Georgia, Eugene S. Klise, Miami University, Copyright ©1976

191  **[4] Lines 28 and 29 on the 1041 tax return:** Since the TD BANKNORTH failed to return the assets
192  that they borrowed, the undersigned has attempted to obtain the help of the IRS since the corporations
193  are withholding the taxes in an escrow account.

195  The 1099A form filed by PETER T PAPOULIAS TRUST, EIN 42-6676616 for the 2006 calendar
196  year.

197  Lender: PETER T PAPOULIAS TRUST, EIN 42-6676616

198  Borrower: TD BANKNORTH , EIN 13-5640479

199  **Explanation:**

6

200 Box 2 represents the amount of assets that the TD BANKNORTH borrowed and are still withholding
201 in an escrow account. The undersigned is using the form for an acquisition of secured property
202 (escrow funds) that was borrowed by the TD BANKNORTH during the 2006 calendar year.
203 Box 4: Value remains the same

204 Box 5: The "yes" box was checked because the TD BANKNORTH is liable for the repayment of the
205 debt. The TD BANKNORTH shows that they are liable due to the fact that the assets deposited by the
206 undersigned are recorded as "Deposit Liabilities" by the TD BANK. (See Schedule RC-E from the
207 FFIEC call reports filed by the TD BANKNORTH every 3 months).

208

209 By helping the undersigned get a return of his assets, the IRS can now tax the total amount that the
210 TD BANKNORTH had created during the 2006 calendar tax year. The total amount that can be
211 collected from the TD BANKNORTH is shown in box 5 of the 1096-1099B filed by PETER T
212 PAPOULIAS TRUST, EIN 42-6676616 for the 2006 calendar year. Box 2 and Box 3 of the 1099-B
213 were added together to get this amount.

214

215 NOTE: This is the minimum amount that the IRS may collect. The total amount of tax may increase,
216 depending on how much public money the TD BANKNORTH had created from the undersigned's
217 commercial energy.

218

219 UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS
220 EASTERN DIVISION

221 PFG PRECIOUS METALS v JOY PERKINS, EDWARD O'CONNELL, TINA UMOH, and JAMES
222 STREETER Case No. 10 C 6462

223 PFG PRECIOUS METALS v SUNTRUST BANK and CAPITAL ONE, N.A., Case No. 10 C 7709
224 MEMORANDUM OPINION AND ORDER, starting at page 9

225
226 The court notes that the Supreme Court has rejected the main premise asserted by the Bank
227 Defendants—that a bank account consists of "money belonging to the depositor and held by the
228 bank." Citizens Bank of Maryland v. Strumpf, 516 US 16, 21 (1995). Rather, a bank account
229 "consists of nothing more or less than a promise to pay, from the bank to the depositor."
230 Id.; see also Bank of Marin v. England, 385 US 99, 101 (1966) ("The relationship of bank and
231 depositor is that of debtor and creditor, founded upon contract."). To the extent Illinois courts have
232 addressed the question of ownership, PFG has cited at least some support for its theory that the Bank

7

233  Defendants owned and controlled the funds at issue. See Continental Cas. Co., Inc., 768 N.E.2d at
234  357-58 ("When money is deposited with a bank, title to it passes and the bank becomes a debtor to
235  the extent of the deposit and, to that extent, the depositor becomes a creditor.").
236

237  The Seventh Circuit has acknowledged the complexity of ownership under these circumstances, as
238  well as the importance of assessing the question of ownership in context. Commissioner of Internal
239  Revenue v. Hendrickson, 873 F.2d 1018, 1023 (7th Cir. 1989) ("'Ownership' is a word of more than
240  one meaning, and context determines which of its meanings is the relevant one in a particular case.").
241  In the words of Circuit Judge Posner: A bank "owns" the deposits made in it, in the sense of having
242  legal title to them; the depositors are merely creditors of the bank in the amount of the deposits, as we
243  have said. But there is a sense—albeit equitable rather than legal—in which it is the depositors who
244  really "own" the deposits, for if the bank refuses (without some contractual or other justification) to
245  return the deposits on demand, the depositors can bring a suit to recover the amount of money that
246  they deposited. Id. at 1023-24. In Hendrickson, the Seventh Circuit concluded that the "aim" of the
247  statute at issue in that case was to "put pressure on the true taxpayer" and that, as a matter of equity,
248  the cause of action lay against "the person who has equitable ownership of the funds in question,
249  [meaning] the depositors in a bank rather than the bank itself, which merely has legal title."
250  Id. at 1024.
251

252  **See attached Unclaimed Property and Due Process: Justifying "Revenue-Raising" Modern**
253  **Escheat - Michigan Law Review Volume 100:319, pages 334 – 336**
254

255  **AS TO PLAINTIFF'S CONSTITUTIONAL RIGHTS**

256  In Fuentes v. Shevin, Attorney General of Florida, et al, (1972) 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.
257  2d 556, the U.S. Supreme Court addressed essentials of the due process clause as it appears in the
258  Fifth and Fourteenth Amendments:

259  For more than a century the central meaning of procedural due process has been clear: "Parties whose
260  rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must
261  first be notified." Baldwin v. Hale, 1 Wall. 223, 233. See Windsor

262  v. McVeigh, 93 U.S. 274; Hovey v. Elliott, 167 U.S. 409; Grannis v. Ordean, 234 U.S. 385. [***570]
263  It is equally fundamental that the right to notice and an opportunity to be heard "must be granted at a
264  meaningful time and in a meaningful manner." Armstrong v. Manzo, 380 U.S. 545, 552.
265

8

266 The constitutional right to be heard is a basic aspect of the duty of government to follow a fair
267 process of decision making when it acts to deprive a person of his possessions. The purpose of this
268 requirement is not [*81] only to ensure abstract fair play to the individual. Its purpose, more
269 particularly, is to protect his use and possession of property from arbitrary encroachment -- to
270 minimize substantively unfair or mistaken deprivations of property, a danger that is especially great
271 when the State seizes goods simply upon the application of and for the benefit of a private party. So
272 viewed, the prohibition against the deprivation of property without due process of law reflects the
273 high value, embedded in our constitutional and political history, that we place on a person's right to
274 enjoy what is his, free of governmental interference. See Lynch v. Household Finance Corp., 405
275 U.S. 538, 552.

276 The requirement of notice and an opportunity to be heard raises no impenetrable barrier to the taking
277 of a person's possessions. But the fair process of decision-making that it guarantees works, by itself,
278 to protect against arbitrary deprivation of property. For when a person has an opportunity to speak up
279 in his own defense, and when the State must listen to what he has to say, substantively unfair and
280 simply mistaken deprivations of property interests can be prevented. It has long been recognized that
281 "fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights. ... [And
282 n]o better instrument has been devised for arriving at truth than to give a person in jeopardy of
283 serious loss notice of the case against him and opportunity to meet it." Joint Anti-Fascist Refugee
284 Committee v. McGrath, 341 U.S. 123, 170-172 (Frankfurter, J., concurring).

286 This is no new principle of constitutional law. The right to a prior hearing has long been recognized
287 by this Court under the Fourteenth and Fifth Amendments. Although the Court has held that due
288 process tolerates variances in the form of a hearing "appropriate to the nature of the case," Mullane v.
289 Central Hanover Tr. Co., 339 U.S. 306, 313, and "depending upon the importance of the interests
290 involved and the nature of the subsequent proceedings [if any]," Boddie v. Connecticut, 401 U.S.
291 371, 378, the Court has traditionally insisted that, whatever its form, opportunity for that hearing must
292 be provided before the deprivation at issue takes effect. E. g., Bell v. Burson, 402 U.S. 535, 542;
293 Wisconsin v. Constantineau, 400 U.S. 433, 437; Goldberg v. Kelly, 397 U.S. 254; Armstrong v.
294 Manzo, 380 U.S., at 551; Mullane v. Central Hanover Tr. Co., supra, at 313; Opp Cotton Mills v.
295 Administrator, 312 U.S. 126, 152-153; United States v. Illinois Central R. Co., 291 U.S. 457, 463;
296 Londoner v. City & County of Denver, 210 U.S. 373, 385-386. See In re Ruffalo, 390 U.S. 544,
297 550-551. "That the hearing required by due process is subject to waiver, and is not fixed in form does

9

298  not affect its root requirement that an individual be given an opportunity for a hearing before he is
299  deprived of any significant property interest, except for extraordinary situations where some valid
300  governmental interest is at stake that justifies postponing the hearing until after the event." Boddie
301  v. Connecticut, supra, at 378-379.

302

303  The Supreme Court of Florida wrote one of the better analytical summaries of U.S. Supreme Court
304  decisions concerning procedural due process secured by the Fifth and Fourteenth Amendment clauses
305  in Ray Lien Construction, Inc. v. Jack M. Wainwrite, (1977) 346 S.2d 1029: Garnishment is but one
306  form of summary remedy historically available to the creditor. It is a method whereby a person's
307  property, money, or credits in the possession, under the control, or owing by another are applied to
308  payment of the former's debt to a third person by proper statutory process against the debtor and
309  garnishee. Because this remedy works a deprivation of debtor's property, it must comply with
310  the requirements of procedural due process.

311

312  For more than a century the central meaning of procedural due process has been clear: "Parties whose
313  rights are to be affected are entitled to be heard, and in order that they may enjoy that right, they must
314  first be notified." Baldwin v. Hale, 68 U.S. (1 Wall.) 223, 233, 17 L. Ed. 531. Fuentes v. Shevin, 407
315  U.S. 67, [**4] 80, 92 S. Ct. 1983, 32 L. Ed. 2d 556 (1972).

316

317  **CONCLUSION**

318  At no time did the grantor/beneficiary to the Plaintiff relinquish his rights to the unclaimed property.
319  The deposit liabilities for calendar year 2006 were claimed in a timely fashion as evidenced by the
320  date of March 30, 2010 on the certified mail receipts. March 30, 2010 is well before the 3 year
321  statutory cutoff of April 15, 2010. The Notice of Disallowance (cp105C) does not question the
322  legitimacy of Plaintiff's claim to the deposit liabilities it simply asserts that the time to file such a
323  claim had passed. This is further evidenced by Defendant(s) letter cp133 dated December 27, 2010
324  showing that the Plaintiff was entitled to the return of the deposit liabilities as withholding credit. The
325  exhibits attached to the verified complaint for the Plaintiff shows that the Defendant(s) agent (IRS)
326  entered a date of May 3, 2010 as the date the claim was received. This date has been shown to be
327  erroneous as it is rebutted by Plaintiff's evidence as Exhibit "A" (certified mail receipt dated March
328  30, 2010). The Defendant(s) agent (IRS) was negligent in entering the date of May 3, 2010.

PETER T PAPOULIAS TRUST

BY: _[signature]_ , TTEE

PETER T PAPOULIAS , TTEE

4175 BRECKENRIDGE CT

ALPHARETTA , GA , 30005

**10**

whether that interest is "property."[89] It is unclear, however, precisely which federal law should be applied in this second step.[90] At least for the federal tax lien statute, this latter determination turned on the ability of the deprived party to "channel" the property;[91] in other cases, the Court has emphasized the existence of monetary value[92] and the ability to exclude.[93]

### B. *Common Holder-Owner Relationships Create a Property Interest for the Holder*



[94] Applying each of the three tests described above to these two contexts suggests

Under the *Roth* theory, the appropriate inquiry is whether nonconstitutional sources create the interest.

---

89.   Merrill, *supra* note 71, at 927 ("Federal constitutional law prescribes the set of criteria an interest must have to qualify as property; whether the claimant has an interest that fits the pattern is then determined by examining independent sources such as state law.").

90.   *See* Merrill, *supra* note 71, at 954 ("The problem with the patterning-definition strategy is that it requires courts to commit to general federal constitutional criteria for the identification of property interests. There is remarkably little useful law to assist in this endeavor.").

91.   *Drye*, 528 U.S. at 61.

92.   *Castle Rock*, 545 U.S. at 766. *See also* Merrill, *supra* note 71, at 987.

93.   *See supra* notes 83–86 and accompanying text.

94.   *See supra* note 78.

95.   



96.   *American Express I*, 630 F. Supp. 2d at 761. Indeed, this is precisely the reasoning that allowed the *American Express I* court to discover a property interest, push forward, and consider the second prong of the due process analysis. *Id.* at 760–61.



The conclusion is the same for escheatable property arising out of un-cashed checks. When one party presents a check to another, he does not immediately surrender ownership of the promised funds but rather maintains his interest in those funds until the drawee bank actually honors the order.[99]



The *College Savings* theory asks whether the claimant had a right to ex-clude others from the supposed property. 



Should a court reject this reasoning by viewing escheat as the assumption of



97. 

98. 

99.  *See* Barnhill v. Johnson, 503 U.S. 393, 396–400 (1992) (holding that a transfer does not occur under the Bankruptcy Code until the drawee bank honors a check, where a "trans-fer" is defined as the "parting with property or with an interest in property" (quoting 11 U.S.C. § 101(54) (1988)) (internal quotation marks omitted)).

100.  *Id.* at 398 n.5 ("New Mexico, the State in which the instant transaction occurred, has adopted the U.C.C. as have all 49 States, the District of Columbia, Guam, and the Virgin Islands." (internal citation omitted)).

101.  *See id.* at 397–99.

102.  *See. e.g.*, Kings Premium Serv. Corp. v. Mfrs. Hanover Trust Co., 496 N.Y.S.2d 524, 526 (N.Y. App. Div. 1985).

103.  *See supra* note 95 and accompanying text.

Case 1:13-cv-02110-TWT   Document 1-1   Filed 06/24/13   Page 13 of 13

a depositor's right to repayment, a bank may again frame its own right to generate profits from the deposits as the relevant property interest.[104] The bank may exclude even the depositor from this contractual right.

Likewise, in the common situation of an uncashed check, the holder will have a property interest under the *College Savings* theory. Since the issuer of the check does not cede his interest in the funds to be transferred until the drawee bank actually honors the check, there is no reason to believe that his general right to exclude has been impaired before that point.

Finally, the interests created in these two contexts would also constitute "property" under the patterning theory, which begins from the *Roth* standard and then inquires "whether the [party's] state-delineated rights qualify as 'property' or 'rights to property'" under federal law.[105] For the reasons discussed above, the threshold component of this test—the nonconstitutional interest—will be present.[106]



### C. A Holder's Property Interest in Unclaimed Property is Extinguished upon Abandonment

Courts may, however, be able to use the property interest justification to endorse a *subset* of revenue-raising escheat statutes—namely, categories of unclaimed property laws apart from those shortening dormancy periods.[110]



---

104.  *See supra* note 96–98 and accompanying text.

105.  *See supra* note 87–88 and accompanying text.

106.  *See supra* notes 95–101 and accompanying text.

107.  Deposited funds "belong to the bank, become part of its general funds, and can be loaned by it as other moneys." Burton v. United States, 196 U.S. 283, 301 (1905) (quoting Bank of the Republic v. Millard, 77 U.S. 152, 155 (1869)). In this way, the bank "exercises dominion over" the deposited funds and "determines who will receive the property." Drye v. United States, 528 U.S. 49, 51 (1999).

108.  *See supra* notes 102–104 and accompanying text.

109.  *See* Wojcik v. City of Romulus, 257 F.3d 600, 609 (6th Cir. 2001).

110.  Again, for the purposes of this Note, this subset is limited to laws authorizing the use of estimation to determine unclaimed property liability. *See supra* note 15.